# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JANE DOE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 07 L 6835 |
| | ) | |
| DREW BRAUER, TRINITY INTERNATIONAL | ) | |
| UNIVERSITY, WILLIAM WASHINGTON, | ) | |
| and PATRICK GILLIAM, | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, JANE DOE, by and through her attorneys, RON A. COHEN and the Office of SLAVIN & SLAVIN, and in complaining against the Defendants, DREW BRAUER, TRINITY INTERNATIONAL UNIVERSITY, WILLIAM "COFFEE" WASHINGTON, and PATRICK GILLIAM, states as follows:

### PARTIES

1.    At all times relevant to this Complaint, the Defendant, TRINITY INTERNATIONAL UNIVERSITY (hereinafter "TIU") was a private university located in Deerfield, Lake County, Illinois, with a campus in Cook County, Illinois.

2.    At all times relevant to this Complaint, the Plaintiff, JANE DOE (hereinafter "DOE") was an undergraduate student at TIU's Trinity College, residing in Antioch, Lake County, Illinois.

3.    During 2006, Defendant, DREW BRAUER (hereinafter "BRAUER") was an employee of TIU, working as the head coach for the woman's basketball team, and residing in Crystal Lake, McHenry County, Illinois.

1

4.    At all times relevant to this Complaint, Defendant, WILLIAM "COFFEE" WASHINGTON (hereinafter "WASHINGTON") was an employee of TIU, working as the Senior Vice-President for Student Affairs, and residing in Vernon Hills, Lake County, Illinois.

5.    At all times relevant to this Complaint, Defendant, PATRICK GILLIAM (hereinafter "GILLIAM") was an employee of TIU, working as the Athletic Director, and residing in Wheeling, Cook County, Illinois.

## FACTS

6.    At all times relevant to this Complaint, DOE was a member of TIU's woman's basketball team, for which she received a scholarship.

7.    BRAUER began his position coaching the TIU woman's basketball team in the fall of 2006. At all times relevant, BRAUER was married, and was pastor of a church in McHenry, Illinois.

8.    During the beginning of the season, BRAUER began taking special interest in DOE, including calling her on the phone and seeking to offer her assistance with her Anatomy class, in which she was struggling. As a result, of such actions, and because of his position as head coach and as a pastor of a church, during the beginning of the season, DOE looked up to BRAUER as a coach, role model, pastor, and authority figure for guidance and protection.

9.    BRAUER, as head coach, and employee of TIU, had, or otherwise caused and led DOE to believe that he had the ability to affect (a) the amount of time played by DOE during basketball games, (b) whether DOE started or otherwise played in basketball games, and (c) DOE's basketball scholarship.

2

**FIRST OVER-NIGHT TOURNAMENT: NOVEMBER 3-4, 2006**

10.    On Friday, November 3, 2006 DOE traveled with the TIU women's basketball team, including BRAUER, to Davenport, Iowa for a scheduled two-day tournament. DOE, her teammates, and BRAUER stayed in the same hotel.

11.    On the evening of November 3, 2006, following the basketball game, DOE, her teammates, and the assistant coach were called by BRAUER to his hotel room to review the game film and discuss the game. When the film and meeting were over, at approximately 11:00 p.m., the team, including DOE, returned to their rooms.

12.    Later in the evening, at or about 11:30 p.m., BRAUER called DOE back to his room.

13.    The team had lost that evening's basketball game, and DOE was feeling upset with the outcome and her performance. DOE believed she was called back to discuss her performance and how she was taking the loss, and therefore returned to BRAUER's room.

14.    Initially, DOE and BRAUER discussed the evening's basketball game and DOE's performance. However, during the visit, BRAUER positioned himself behind DOE and began rubbing her shoulders. DOE made it clear to BRAUER that she was uncomfortable, and the physical contact was unwelcome and un-consented-to, at which point BRAUER stopped rubbing her shoulders.

15.    DOE indicated her wish to leave BRAUER's room, however BRAUER requested she stay to discuss the game further. DOE felt nervous and uncomfortable, but was fearful of disobeying her coach, so did not immediately leave the room.

16.    DOE and BRAUER briefly resumed discussing the game, however shortly thereafter, BRAUER again positioned himself behind DOE and resumed rubbing her shoulders

3

and back without consent. DOE, while in a state of shock and humiliation, and feeling fearful and overpowered, was unable to escape BRAUER. BRAUER then removed DOE's clothes, proceeded to kiss DOE's neck and shoulders, and sexually assaulted DOE without her consent.

17.    When BRAUER was finished, DOE left his room, scared and shaken. As DOE was leaving, BRAUER, warned her not to tell anyone about what had happened. BRAUER's words were a purposeful attempt to intimidate and humiliate DOE from reporting the sexual assault and battery.

18.    Throughout the next day, on November 4, 2006, BRAUER directed sexual gestures at DOE, including winking and blowing kisses, leered at DOE during practice, and otherwise intimated more unwelcome sexual encounters. BRAUER also made repeated references to the sexual assault and battery the night before, including BRAUER saying that had it not been for that encounter she wouldn't be making all her shots, and telling her that they should "do it" more often.

19.    Following this over-night trip, DOE became withdrawn and distracted as a result of the sexual assault and battery. During this time, BRAUER continued attempting to contact DOE outside of practices. DOE was fearful of BRAUER due to his position of authority and her perception of the power and control he had over her basketball and school career, and she was concerned for the damage to her educational opportunities, position on the team, and reputation should she report BRAUER's actions. DOE was also confused and distressed because of BRAUER's position as head coach and church pastor, and his repeated claims of wanting to help and protect DOE, despite his actions.

SECOND OVER-NIGHT TOURNAMENT: NOVEMBER 17-18, 2006

20.    On Friday, November 17, 2006, DOE again traveled with the TIU women's basketball team, including BRAUER, to Grand Rapids, Michigan for another scheduled two-day tournament.

21.    During the bus ride to Michigan, BRAUER phoned DOE on her cell phone, told her she looked beautiful, and asked her to move to the front of the bus where BRAUER was seated. DOE refused and ended the call.

22.    During this tournament, as before, DOE, her teammates, and BRAUER stayed in the same hotel. However, this time, DOE's hotel room was directly across the hall from BRAUER's. Upon information and belief, BRAUER arranged for DOE's hotel room to be directly by his.

23.    Upon arriving at the hotel, DOE entered her room to prepare for the evening's game. When she left her room to head for the gym, BRAUER left his room and followed her. DOE took the stairs, rather than the elevator, and BRAUER followed her down the stairs. While walking down the stairs, BRAUER told DOE that if she scored a lot of points during the game, he would give her "something special." DOE ignored the unwelcome remark and continued to the gym.

24.    After the game, which the team lost, and the team meeting, DOE returned to her room. BRAUER called DOE back to his room purportedly to talk about the game and her performance.

25.    DOE hesitated for fear of being sexually assaulted. However, not wishing to disobey her coach, fearful of the effects of her refusal, and seeing that his door was open and visible to passersby and thereby believing it was safe, DOE went to his room. After initial

5

discussions regarding the game, BRAUER closed the door and sexually advanced, rubbed and kissed, and sexually assaulted DOE without her consent and against her will.

26.    As DOE was leaving BRAUER's room, he warned her that if she didn't play better during the next game, he would "bench her" and not allow her to start the game. BRAUER's words were a purposeful attempt to intimidate and humiliate DOE from reporting the sexual assault and battery.

27.    The following day, on November 18, 2006, after the basketball game in which DOE played well, scoring 33 points, BRAUER congratulated her for her performance and said to DOE, "Do you want a kiss now or wait for later?" and otherwise intimated more unwelcome sexual encounters.

28.    After they returned back to the TIU campus following this second tournament, DOE returned to her dorm. That evening, BRAUER called DOE while he was driving home and told her he loved her. DOE replied that she did not love him.

**RETALIATORY ACTION**

29.    During the next practice, on Monday, November 20, 2006, BRAUER treated DOE harshly, including yelling at her in front of the team. Following practice that day, BRAUER told DOE that he did not think he would be starting her during the next game. BRAUER's actions and words were a purposeful attempt to retaliate against DOE for rebuking his remarks the prior evening, and an attempt to humiliate and intimidate DOE from reporting the sexual assault and battery.

30.    Following these events, DOE continued to try to ignore defendant's unwanted advances, including frequent phone calls, but remained fearful of what rebuking his efforts would mean for her basketball career, including her playing time, starting position, and

6

scholarship, and remained distraught about the discrepancy between BRAUER's position of authority as head coach and church pastor, and his actions of sexual assault and battery.

31.     Over the Thanksgiving holiday, November 22 - 27, 2006, BRAUER continued making unwanted phone calls to DOE.  DOE told BRAUER that his phone calls were bothering her and that she needed time by herself.  BRAUER ignored DOE's requests and called her on Thanksgiving day as well as Sunday, November 26, 2006, each time expressing his desire to see her.

32.     When DOE's mother learned of the phone calls on November 26, 2006, she called BRAUER to confront him and demand to know what was going on.  BRAUER replied tersely that he did not want to speak with her.  DOE's mother responded by calling PATRICK GILLIAM to complain of BRAUER's behavior.

33.     After Thanksgiving break, BRAUER called DOE to tell her that he had been called into a meeting with COFFEE WASHINGTON and PATRICK GILLIAM, and accusatorily asked DOE whether she knew anything about it.  BRAUER's words were a purposeful attempt to intimidate DOE into not reporting the sexual assault and battery in the event she was called in to speak with TIU officials.

34.     BRAUER called later that night and told DOE that he had been fired for his actions with another member of the woman's basketball team.  BRAUER also told DOE that he was telling his wife about what he had done with DOE, and that he wouldn't be calling her anymore.

FIRST MEETING

35.     Later in the week, prior to a home game, DOE was called into the office of PATRICK GILLIAMS, with COFFEE WASHINGTON and his secretary, Katherine Fulkerson,

7

also present.  DOE was questioned about what she knew of BRAUER and whether she noticed him acting differently with the team.

36.     During this meeting, WASHINGTON told DOE that the night before, BRAUER had told WASHINGTON that he had had a consensual intimate relationship with DOE.  DOE was nervous and scared, skeptical of whether GILLIAMS and WASHINGTON were looking to help her or to simply protect BRAUER, TIU, and themselves, and fearful that no one would believe her, and therefore denied any sexual contact with BRAUER, consensual or not. WASHINGTON and GILLIAMS told DOE to get back to them within 24 hours to tell them whether she wished to admit to BRAUER's claim of a consensual intimate relationship, and stated that they would have to notify BRAUER's congregation of what had happened.

37.     Throughout the meeting, through their words and actions, GILLIAMS and WASHINGTON treated DOE like the offender, not the victim.  They intimidated and humiliated DOE to get her to admit that she was not a victim of sexual assault or battery.  GILLIAM and WASHINGTON's actions were a purposeful attempt to prevent DOE from reporting the assault and battery and to accept blame for herself so to protect BRAUER, TIU, and themselves.

38.     Upon information and belief, GILLIAMAS and WASHINGTON conducted additional meetings with other members of the TIU woman's basketball team concerning BRAUER and his activities with the team.

39.     Following this meeting, DOE was in a state of shock and disbelief, was scared and overwhelmed by what had been occurring, and was fearful of future actions being taken against her.  DOE told her mother and step-father about how BRAUER had sexually assaulted her during the two trips and had been constantly contacting her throughout the season.  She also

8

told her mother and step-father about how the TIU officials were accusing her of having a consensual, intimate relationship with BRAUER.

**SECOND MEETING**

40.    On or about December 20, 2006, DOE was called to meet with WASHINGTON and GILLIAM again. DOE was fearful of what would occur during the meeting, and brought her mother to the meeting in WASHINGTON's office.

41.    During this meeting, WASHINGTON and GILLIAM again accused DOE of engaging in consensual sexual activities in violation of school rules of conduct, and otherwise blamed her for the events that had transpired. DOE was informed that her basketball scholarship as well as her standing within the university was in jeopardy. DOE was aware that WASHINGTON and GILLIAM were not looking to help or protect her but were merely trying to protect the school and themselves.

42.    WASHINGTON and GILLIAM ordered DOE to write a "confession" of engaging in consensual sexual activity in violation of school rules. DOE was shocked and in disbelief over what was occurring, was intimidated by WASHINGTON and GILLIAM and the punishment they were threatening if she did not comply with their demands, and was desperate to end the meeting and get away from the accusations being leveled against her. Therefore, with WASHINGTON and GILLIAM imposing over her and indicating what the "confession" was to include, under duress, DOE wrote out a statement pursuant to their direction. Throughout the meeting, DOE was terrified and humiliated, and was crying as a result of the allegations and berating of WASHINGTON and GILLIAM.

43.    At the conclusion of the meeting, WASHINGTON and GILLIAM scheduled another meeting to occur on January 3, 2007 (which was later rescheduled to January 4, 2007) to

further discuss whether DOE would be eligible to play basketball or return to school the following semester. WASHINGTON and GILLIAM's actions and words were a purposeful attempt to intimidate and humiliate DOE from reporting the sexual assault and battery.

## THIRD MEETING

44.    On January 4, 2007, DOE, her mother and stepfather again met with WASHINGTON and GILLIAM.

45.    During this meeting, WASHINGTON and GILLIAM repeated their accusations of DOE's "misconduct," and blamed her for what had transpired. WASHINGTON and GILLIAM presented a list of disciplinary action which DOE would have to agree to in order to remain at TIU. The disciplinary action included:

    a)    a year of probation at the school,

    b)    20 hours of community service,

    c)    completion of an "accountability/disciplineship" program whereby DOE would be paired up with a faculty member, and

    d)    outside counseling, with the school being given a signed 'records release' for any records created.

46.    During this January 4, 2007 meeting, WASHINGTON and GILLIAM indicated that DOE should have been suspended from five basketball games, but that they did not wish to draw more attention to the matter. WASHINGTON and GILLIAM also notified DOE that one of her grades was being changed from a C+ to a B-. In addition, during the meeting, WASHINGTON and GILLIAM strongly recommended that DOE consider transferring to another school.

10

<u>COUNT I</u>
Assault against Defendant Brauer

47.   Paragraphs 1-46 are re-alleged here as if fully set forth herein.

48.   BRAUER willfully and intentionally committed an assault upon DOE on November 3, 2006 and November 17, 2006, by his attempts at touching, kissing, and forcing sexual intercourse with DOE.

49.   In addition, during the fall of 2006, BRAUER willfully and intentionally committed an assault on DOE with repeated, inappropriate sexual behavior, including winking, blowing kisses, making sexual remarks, and otherwise intimating unwelcome sexual encounters.

50.   These actions of BRAUER were done intentionally to lead DOE to believe she would be subject harmful and offensive contact, or to cause harmful and offensive contact.

51   Such actions created in DOE a reasonable apprehension of an imminent battery.

52.   These actions of BRAUER were done without the consent of DOE.

53.   BRAUER's acts of assault were willful, wanton, reckless and outside the scope and authority of his employment.

54.   As a direct and proximate result of the aforementioned conduct of BRAUER, DOE has suffered and continues to suffer extreme and severe emotional distress, great mental anguish, humiliation, depression, loss of appetite, loss of sleep, and inability to focus and function on daily activities, including school work and athletic activities with the woman's basketball team.   Plaintiff is currently receiving mental health treatment and psychological therapy.

WHEREFORE, Plaintiff demands compensatory damages against defendant BRAUER in his individual capacity in an amount in excess of $50,000.00, and punitive damages in an amount

11

in excess of $50,000.00, plus the costs of this action, and such other and additional relief as this Court deems just and fair.

## COUNT II
### Intentional Infliction of Emotional Distress Against Defendant Brauer

55.    Paragraphs 1-46 are re-alleged here as if fully set forth herein.

56.    The conduct of BRAUER, as identified above, including, (a) forcing non-consensual touching and sexual intercourse; (b) threatening DOE's position on the basketball team, and scholarship; (c) continuing to make inappropriate and threatening sexual remarks to plaintiff; was intentional, reckless, and done willfully and wantonly.

57.    The aforementioned conduct of BRAUER was intended to inflict, or known with a high probability that it would inflict extreme and severe emotional distress to DOE.

58.    Defendant's extreme and outrageous conduct towards plaintiff was unlawful behavior outside the scope of his employment and outside the scope of his authority as a head coach of the women's basketball team.

59.    As a direct and proximate result of the aforementioned conduct of BRAUER, DOE has suffered and continues to suffer extreme and severe emotional distress, great mental anguish, humiliation, depression, loss of appetite, loss of sleep, and inability to focus and function on daily activities, including school work and athletic activities with the woman's basketball team. Plaintiff is currently receiving mental health treatment and psychological therapy.

WHEREFORE, Plaintiff demands compensatory damages against defendant BRAUER in his individual capacity in an amount in excess of $50,000.00 and punitive damages in an amount

in excess of $50,000.00, plus the costs of this action, and such other and additional relief as this Court deems equitable and just.

## COUNT III
### Intentional Infliction of Emotional Distress Against Washington, Gilliam, TIU

60.    Paragraphs 1-46 are re-alleged here as if fully set forth herein.

61.    WASHINGTON and GILLIAM at all times alleged were acting within the scope of their employment with TIU, and in furtherance of the business of TIU, and motivated, at least in part, by an intent to serve TIU's purposes.

62.    The conduct of WASHINGTON and GILLIAM, as identified above, including (a) frightening, humiliating, and intimidating DOE, including by punishing her for being the victim of sexual assault and battery; (b) threatening DOE with the risk of losing her scholarship, being denied the ability to play basketball, and being expelled from school; (c) bribing DOE by changing her grade and purportedly reducing her 'punishment' by sparing her a five-game suspension; (d) stigmatizing DOE by accusing her of causing and consenting to the sexual assaults, in seeking to convince her that the sexual assaults were her fault; and (e) otherwise engaging in extreme, outrageous, offensive, oppressive and distressing behavior so to prohibit DOE from reporting her sexual assault; was intentional, reckless, and done willfully and wantonly.

63.    The aforementioned conduct of WASHINGTON and GUILLIAM was intended to inflict, or known with a high probability that it would inflict extreme and severe emotional distress to DOE.

64.    As a direct and proximate result of the aforementioned conduct of WASHINGTON and GUILLIAM, DOE has suffered and continues to suffer extreme and severe

13

emotional distress, great mental anguish, humiliation, depression, loss of appetite, loss of sleep, and inability to focus and function on daily activities, including school work and athletic activities with the woman's basketball team.   Plaintiff is currently receiving mental health treatment and psychological therapy.

WHEREFORE, Plaintiff demands compensatory damages against defendants COFFEE WASHINGTON and GUILLIAM, individually and in their capacities as agents and servants of TIU, and TRINITY INTERNATIONAL UNIVERSITY, under the doctrine of *respondeat superior*, in an amount in excess of $50,000.00 and punitive damages in excess of $50,000.00, plus the costs of this action, and such other and additional relief as this Court deems equitable and just.

### COUNT IV
**Battery against Defendant Brauer**

65.    Paragraphs 1-49 are re-alleged here as if fully set forth herein.

66.    BRAUER willfully and intentionally committed a battery upon DOE on November 3, 2006 and November 17, 2006, by touching, kissing, and forcing sexual intercourse with DOE.

50.    These actions of BRAUER were done intentionally to cause harmful and offensive conduct.

51.    These actions of BRAUER were done without the consent of DOE.

52.    These actions of BRAUER did result in harmful and offensive contact.

53.    BRAUER's acts of battery were willful, wanton, reckless and outside the scope and authority of his employment.

14

54.    As a direct and proximate result of the aforementioned conduct of BRAUER, DOE has suffered and continues to suffer extreme and severe emotional distress, great mental anguish, humiliation, depression, loss of appetite, loss of sleep, and inability to focus and function on daily activities, including school work and athletic activities with the woman's basketball team.    Plaintiff is currently receiving mental health treatment and psychological therapy.

WHEREFORE, Plaintiff demands compensatory damages against defendant BRAUER in his individual capacity in an amount in excess of $50,000.00, and punitive damages in an amount in excess of $50,000.00, plus the costs of this action, and such other and additional relief as this Court deems just and fair.

Respectfully submitted,

By: _____
One of Plaintiff's attorneys

Ron A. Cohen
30 North LaSalle St., Suite 3400
Chicago, IL 60602-3337
312/ 346-1145

SLAVIN & SLAVIN
20 South Clark Street, Ste 510
Chicago, IL 60602
312/ 782-7848

15

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JANE DOE | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 07 L 6835 |
| | ) | |
| DREW BRAUER, TRINITY INTERNATIONAL | ) | |
| UNIVERSITY, WILLIAM WASHINGTON, | ) | |
| and PATRICK GILLIAM, | ) | |
| Defendants. | ) | |

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222

I, Mark F. Slavin, as attorney for JANE DOE, being first duly sworn on my oath, state:

1.    I, Thomas Gamache am an attorney for the Plaintiff in the above entitled suit.

2.    The total of money damages sought in this civil action does exceed $50,000.00

FURTHER AFFIANT SAYETH NOT.

THOMAS GAMACHE

Attny No.: 36363
SLAVIN & SLAVIN
Attorneys for Plaintiff
20 South Clark Street, Ste 510
Chicago, Illinois 60603
312-782-7848 (p)
312-782-8272 (f)

Subscribed and sworn to before me
this 21 day of December, 2007.

NOTARY PUBLIC

"OFFICIAL SEAL"
ELSA GUZMAN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3/7/2010

16